## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVID E. JONES** | **CIVIL ACTION** |
| **VERSUS** | **No. 15-635** |
| **ILLINOIS CENTRAL RAILROAD COMPANY ET AL.** | **SECTION I** |

### ORDER AND REASONS

The remaining defendant, Illinois Central Railroad Company ("Illinois Central"), has filed a motion[1] for partial summary judgment as to Count II of plaintiff's two-count complaint.[2] Illinois Central seeks summary judgment with respect to plaintiff, David Jones' ("Jones"), claim that Illinois Central violated subsection 20109(c)(1) of the Federal Railroad Safety Act ("FRSA"). Illinois Central contends that the nature of Jones' injury does not entitle Jones to the protection of the FRSA. Illinois Central is not at this time seeking summary judgment with respect to Count I of Jones' complaint which asserts a claim pursuant to the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq*. ("FELA").[3]

For the reasons below, Illinois Central's motion is **DENIED**. The Court instead concludes that Jones' injury brings him within the scope of the FRSA's protection. The Court notes that it does not decide whether Illinois Central's actions violated the FRSA, but only that Jones does state a claim pursuant to that Act.

---

[1] R. Doc. No. 38. Defendants, Andrea Davis and Ben Shannon, were also parties to the motion for summary judgment, but they have been dismissed from the case. *See* R. Doc. Nos. 43, 44.
[2] R. Doc. No. 28.
[3] R. Doc. No. 38-3, at 2.

**BACKGROUND**

There is no dispute regarding the facts that are material to the Court's resolution of this motion.[4]   Illinois Central is an interstate railroad carrier covered by the FRSA, 49 U.S.C. § 20109.  Jones was employed by Illinois Central as a conductor.  In late 2009 or early 2010, Jones was diagnosed for the first time with high blood pressure.  His physician told him that his condition was probably hereditary.

On February 2, 2014, Jones was scheduled to start work at 5:00 or 5:30 PM.  When he arrived at work that day, he felt capable of doing his job and he did not tell anyone that he should not be working.  Jones worked the first hour or two of his shift without incident, and then began to experience a headache.  He took a break on the locomotive and he then resumed working.

After continuing work for a time, Jones returned to the engine and told the locomotive engineer with whom he was working that he needed to take another break because his head was hurting.  At that time, Jones did not attribute his headache to any problem with his blood pressure.  He just knew that he had a headache.  It is at this point that Jones' and Illinois Central's versions of the events begin to diverge.

For the purpose of evaluating this motion, the evidence of Jones—the nonmovant—is to be believed and all justifiable inferences are to be drawn in his favor.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (citation omitted).  Jones contends that another conductor employed by Illinois Central saw the condition Jones was in at 9:15 PM and told Illinois Central's yardmaster on duty, Ben Shannon, to call an ambulance.[5]  Jones also claims that Illinois Central's assistant trainmaster on duty, Andrea Davis, directed Shannon to call an ambulance for Jones if Shannon

---

[4] These facts, which Jones does not contest, R. Doc. No. 45-1, at 1, were provided by Illinois Central in its statement of material facts in support of its motion.  R. Doc. No. 38-2, at 1–3.
[5] R. Doc. No. 45-1, at 2.

thought it was necessary.[6]  Jones asserts that despite these warnings, no ambulance was ever called.[7]

Ultimately, Jones was driven to the hospital.[8]  Jones alleges that he suffered significant brain damage and that he is now unable to work[9]  Jones claims that Illinois Central's delay in obtaining medical treatment for him "caused, or at the very least, worsened [his] brain hemorrhage and resulting brain damage."[10]

## LAW AND ANALYSIS

### I.   LEGAL STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt

---

[6] R. Doc. No. 45-1, at 3.
[7] R. Doc. No. 28, ¶ 19.
[8] R. Doc. No. 28, ¶¶ 22–23.
[9] R. Doc. No. 28, ¶ 24.
[10] R. Doc. No. 45-1, at 4.

as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue.  *Id*. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor."  *Id*. at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.   ANALYSIS

Jones asserts in Count II of his amended complaint that Illinois Central violated section 20109 of the FRSA, in whole or in part, "by failing to provide immediate and prompt medical attention to [Jones] when it was clear that such medical attention was urgently needed considering [Jones'] deteriorating condition, which was known and witnessed by [Illinois Central]."[11]   The applicable subsection of the statute is subsection (c)(1), which provides as follows:

> **(c) Prompt medical attention.**—
>
> **(1) Prohibition.** -- A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment *of an employee who is injured during the course of employment*. If transportation to a hospital is requested by an employee *who is injured during the course of employment*, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.

49 U.S.C. § 20109(c)(1) (emphasis added).

---

[11] R. Doc. No. 28, ¶ 27.

By its plain terms, subsection (c)(1) applies only to employees who are "injured during the course of employment."  The outcome of this motion turns on whether Jones meets that description.  Illinois Central argues that Jones is not protected by subsection (c)(1) because in order to be "injured during the course of employment" an employee must suffer a work-related injury, which does not include the manifestation of a pre-existing condition.[12]  Jones asserts that the statute only imposes a temporal requirement of suffering an injury while at work.[13]

### A.  There is no genuine issue of material fact with respect to this legal question.

Although Jones asserts that there are fact disputes precluding resolution of this motion, such disputes are not material to the issue of statutory interpretation raised by Illinois Central. Even assuming that Jones is correct that Illinois Central refused to call an ambulance for Jones and that the delay "contributed substantially" to Jones' ultimate injury,[14] there is no genuine issue of material fact before the Court.  An employee must first be "injured during the course of employment" for an employer to owe a duty not to "deny, delay, or interfere with [the employee's] medical or first aid treatment."  49 U.S.C. § 20109(c)(1).

Jones admits that his "brain hemorrhage was triggered by high blood pressure" and that his "hypertension is not 'work-related.'"[15]  Accordingly, Jones concedes that, even if it was later aggravated by Illinois Central's lack of response, his injury was triggered by the manifestation of a pre-existing condition while he was at work.  Whether an injury, triggered while an employee is at work but not caused by the employee's work, can be considered an injury sustained "during

---

[12] R. Doc. Nos. 38-3, 38-4.
[13] R. Doc. No. 45, at 2–3.  Jones also asserts that genuine issues of material fact prevent the Court from resolving this dispute at the summary judgment stage.  R. Doc. No. 45, at 14.
[14] R. Doc. No. 45, at 3.
[15] R. Doc. No. 45, at 2.  The Court does not imply that Jones concedes that his injury was not "work-related" in the legal sense, but rather only that Jones has admitted that the factor that triggered his brain hemorrhage—his hypertension—was not caused by work.

the course of employment" is precisely the question of law Illinois Central asks this Court to resolve.  There is, therefore, no genuine dispute regarding a fact material to the Court's inquiry.

**B. The manifestation of Jones' pre-existing condition while Jones was at work constitutes an injury "during the course of employment" within the meaning of subsection (c)(1).**

      **a. The Court is unaware of any cases directly addressing this issue.**

The parties have not cited, and the Court's own research has not revealed, any cases directly addressing this issue.  Illinois Central claims that the U.S. Third Circuit Court of Appeals decision in *Port Authority Trans-Hudson Corp. v. Dep't of Labor*, 776 F.3d 157 (3d Cir. 2015) ("*PATH v. DOL*") supports its interpretation.[16]  But that case does not address the question before the Court.

In *PATH v. DOL*, the Third Circuit addressed subsection 20109(c)(2) of the FRSA—the provision adjacent to the subsection at issue in this case.  776 F.3d 157.  Subsection (c)(2) prohibits a railroad carrier from disciplining an employee "for following orders or a treatment plan of a treating physician."[17]  49 U.S.C. § 20109(c)(2).  Unlike subsection (c)(1) of the FRSA, however, subsection (c)(2) does not explicitly limit its protections to treatment plans for injuries

---

[16] R. Doc. No. 38-3, at 5–6.

[17] 49 U.S.C. § 20109(c)(2) provides in its entirety:

    **(c) Prompt medical attention.—**

    **(2) Discipline.--** A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty or, if there are no pertinent Federal Railroad Administration standards, a carrier's medical standards for fitness for duty. For purposes of this paragraph, the term "discipline" means to bring charges against a person in a disciplinary proceeding, suspend, terminate, place on probation, or make note of reprimand on an employee's record.

sustained "during the course of employment."  The issue before the Third Circuit in *PATH v. DOL* was whether the "treatment" referred to in subsection (c)(2) refers back to the "treatment" in subsection (c)(1), thereby incorporating the "during the course of employment" limitation into subsection (c)(2).  *PATH v. DOL*, 776 F.3d at 162.

The Third Circuit concluded that subsection (c)(2) applies only to orders or treatment plans related to injuries that, as in subsection (c)(1), are sustained "during the course of employment."  *Id*.  The Third Circuit therefore rejected the plaintiff's argument that subsection (c)(2) prevented his employer from disciplining him for following a treatment plan that stemmed from an off-duty injury.  *Id.* at 159.  Throughout its opinion, the Third Circuit refers to the requirement that an injury occur "during the course of employment" as a requirement that the injury be obtained "on-duty" or that it be "work-related."  *Id.* at 159, 162, 163, 165, 166, 168, 169.  Illinois Central cites these references as authority for its position that the injury must be caused by work in order to fall within the scope of subsection (c)(1).[18]  But Illinois Central's reliance on this phraseology is misplaced.

The Third Circuit nowhere indicated that an "on-duty injury" or "work-related injury" meant anything more than that the injury must have occurred while the plaintiff was working.[19] The injury in *PATH v. DOL* took place in the plaintiff's home while he was moving boxes.  776 F.3d at 159.  Accordingly, there was no need for the Third Circuit to decide whether an injury

---

[18] *See generally* R. Doc. No. 38-3.

[19] Although the Third Circuit seemingly uses the phrases "on-duty injury" and "work-related injury" interchangeably in its opinion, it may be possible that an injury occurs "during the course of employment" *either* if it occurred "on duty" *or* was "work-related" in the sense that it was caused by work.  The Third Circuit did not consider this possible distinction because it did not need to; the injury in *PATH v. DOL* clearly did not occur while the plaintiff was "on duty" and it was not "work-related."  In this case, the Court simply decides that an injury occurring while an employee is on duty is sufficient to bring that employee within the scope of subsection (c)(1)'s protection.  This Court does not decide whether an injury that occurs off duty but that is caused by work renders an employer potentially liable pursuant to subsection (c)(1).

occurring at work must also be caused by work in order to resolve the issue before it, as the plaintiff's injury in that case did not occur "during the course of employment" under either interpretation offered by the parties in this case.  It is worth noting, however, that at one point the Third Circuit actually refers to the prerequisite for protection under subsection (c)(1) as a "temporal limitation."  *Id.* at 162.  *PATH v. DOL* is at least as supportive of Jones' position as it is of Illinois Central's, if not more so.

### b.  The plain meaning of the statute supports Jones' interpretation.

In the absence of binding or persuasive authority, the Court turns first to the language of the statute itself in order to resolve its meaning.  The U.S. Supreme Court has explained that of all the canons of construction employed by courts to interpret statutes, giving the statute its plain meaning is the "cardinal canon before all others."  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).  The reason is "that courts must presume that a legislature says in a statute what it means and means in a statute what it says."  *Id.* at 253–54 (citations omitted).  "When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."  *Id.* at 254 (citations and internal quotations omitted).  In determining whether the words of a statute are unambiguous, courts look to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citations omitted).

Subsection (c)(1) states that "[a] railroad carrier . . . may not deny, delay, or interfere with the medical or first aid treatment of an employee *who is injured during the course of employment*." (emphasis added).  The Court holds that this language unambiguously covers employees who suffer injury while on duty at their place of employment, irrespective of the injury's cause.  This interpretation accords the statute its plain meaning by construing the term "during" in its ordinary sense as a temporal requirement.  The Court's view is supported by the

dictionary definition of the term "during," which is defined as "throughout the entire term of" and "at some time in the course of." Merriam—Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/during (last visited October 7, 2015). These definitions buttress Jones' contention that the statute intends "during the course of employment" to create only a time-based requirement that the injury occur "at some time in the course of employment."

If this Court were to decide, as Illinois Central urges, that the statute excludes injuries occurring during the course of employment that are not caused by the course of employment, an additional burden would be placed on plaintiffs that is not justified by the text of the statute itself. If Congress had intended that the FRSA cover only some employees "injured during the course of employment" but not others, surely it would have said so. Absent such an express limitation, the Court finds it inappropriate to conclude that Congress meant what it did not state.

Because the language of the statute is clear, references to legislative history and regulatory purpose are unnecessary to determine its meaning; "judicial inquiry is complete." *Connecticut Nat. Bank*, 503 U.S. at 254. Nevertheless, the legislative history and regulatory purpose of subsection (c)(1) support the Court's interpretation, and provide an alternative basis for the Court's holding.

### c. The regulatory purpose of subsection (c)(1), as evidenced by the legislative history, also supports Jones' interpretation.

"Even though . . . the words used . . . are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing, nevertheless it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454–55 (1989) (internal quotations and citations omitted). The U.S. Fifth

Circuit Court of Appeals has explained that "[i]n determining the meaning of [a] statute, [courts] look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."  *CleanCOALition v. TXU Power*, 536 F.3d 469, 473 (5th Cir. 2008).

Illinois Central claims that "the legislative history of section 20109(c) . . . confirms that Congress intended this section of the FRSA to protect workers who seek medical attention for work-related injuries."[20]  Because Illinois Central does not consider the manifestation of a pre-existing condition while an employee is on-duty to be a "work-related injury," it argues that to include such injuries within the protection of subsection (c)(1) conflicts with or exceeds the purpose of the FRSA.[21]  Although Illinois Central is generally correct in its view of the purpose of section 20109(c), it is incorrect that the Court's interpretation of subsection (c)(1) conflicts with that purpose.  To the contrary, the goals of subsection (c)(1) could not be achieved without extending protection to injuries like those allegedly suffered by plaintiff.

The Administrative Review Board ("ARB"), the agency to which the U.S. Secretary of Labor has delegated authority to review appeals of decisions by administrative law judges under the FRSA,[22] summarized the pertinent legislative history regarding section 20109(c) in *Santiago v. Metro-North Commuter R.R. Co., Inc.*, ARB Case No. 10-147; 2012 WL 3255136 (July 25, 2012).

In *Santiago*, the ARB recounted as follows:

A series of hearings in the 110th Congress signaled increasing public and Congressional concern with rail safety, including chronic under-reporting of rail injuries, widespread harassment of employees reporting work-related injuries, and interference with medical treatment of injured employees.  In particular, . . .

---

[20] R. Doc. No. 38-3, at 8.

[21] R. Doc. No. 48-1, at 4.

[22] The U.S. Secretary of Labor has jurisdiction over an FRSA complaint pursuant to 49 U.S.C. § 20109(d)(1).  The Secretary delegated that authority in Secretary's Order No. 1-2010 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 75 Fed. Reg. 3924, § 5(c)(15) (Jan. 15, 2010).

testimony before Congress identified numerous management policies that deterred employees from reporting on-the-job injuries including subjecting employees who report injuries to increased monitoring and scrutiny from supervisors, which could lead to discipline and termination, supervisors accompanying employees on their medical appointments and attempting to influence employee medical care, sending employees to company physicians instead of physicians of their own choosing, and light-duty work programs, which have the injured employee report to work, but perform no work, to avoid having to report the injury as a lost work day to the Federal Railroad Administration.

*Santiago*, 2012 WL 3255136, at *8 (citations omitted).

As a result of these findings, Congress amended the FRSA by enacting the Rail Safety Improvement Act of 2008 ("RSIA").  Pub. L. No. 110–432, 122 Stat. 4848 (October 16, 2008).  Prior to the amendment, section 20109 "was exclusively an anti-retaliation provision."  *PATH v. DOL*, 776 F.3d at 161.  Subsections (a) and (b) of section 20109, which have been in effect since before the amendment, provide "protections to employees who assist in investigations into railroad safety, refuse to violate laws pertaining to railroad safety, notify a railroad or the Secretary of Transportation about 'work-related' injuries or illnesses, and report and/or refuse to work in hazardous conditions."  *Id.*  The RSIA added *inter alia* subsection (c) to section 20109.  Pub. L. No. 110–432.

Subsection (c)(2)—like subsections (a) and (b)—is an "anti-retaliation provision" aimed at deterring rail carriers from disciplining employees for, among other things, "following orders or a treatment plan of a treating physician."  49 U.S.C. § 20109(c)(2).  Subsection (c)(1), however, is a "substantive provision"  whose "primary objective is to ensure that railroad employees are able to obtain medical attention for injuries sustained on-duty."  *PATH v. DOL*, 776 F.3d at 163.  Accordingly, while subsection (c)(1) may have some anti-retaliatory function, its primary purpose is remedial in nature.  Because the U.S. Supreme Court has stated that "safety legislation is to be liberally construed to effectuate the congressional purpose," *Whirlpool*

*Corp. v. Marshall*, 445 U.S. 1, 13 (1980), the remedial purpose of subsection (c)(1) weighs in favor of a more liberal construction.

But to the extent that subsection (c)(1) does have a secondary objective as an anti-retaliation statute, the Court's interpretation of the subsection supports that objective.  The reporting requirements promulgated by the Federal Railroad Administration ("FRA") dictate that rail employers report any new case involving an employee's "death, injury or occupational illness . . . if an event or exposure *arising from the operation of a railroad* is a discernable cause of the resulting condition or a discernable cause of a significant aggravation to a pre-existing injury or illness."[23]   49 C.F.R.  §  225.19(d)  (emphasis added).   Because the reporting requirements expressly exclude any "injury or illness [that] involves signs or symptoms *that surface at work but result from a non-work related event* or exposure that occurs outside the work environment," 49 C.F.R. § 225.15(c)(1) (emphasis added), Illinois Central argues that the Court's view of subsection (c)(1) will require employers to react to injuries that occur at work but are not reportable to the FRA.[24]   In Illinois Central's view, such a requirement does not advance subsection (c)(1)'s purpose of combating the "various actions taken by railroad carriers to discourage employees from reporting work-related-injuries [sic]."[25]

To the extent Illinois Central is correct that the goal of subsection (c)(1) is to prevent railroad carriers from retaliating against employees who sustain injuries that might be reportable,[26] Congress must have recognized that the incentive for an employer to discourage treatment is present any time an employee is injured while at work.  After all, the cause of an on-

---

[23] R. Doc. No. 48-1, at 3.

[24] R. Doc. No. 48-1, at 3.

[25] R. Doc. No. 48-1, at 3.

[26] As the Court previously noted, deterrence is not the primary objective of subsection (c)(1). Rather, as a substantive provision, the goal of subsection (c)(1) is chiefly remedial.  *PATH v. DOL*, 776 F.3d at 163.

duty injury is often unclear.  An employee can have a heart attack, for example, and it may not become evident until much later whether the attack was brought on by work-related stress or a pre-existing condition.  Because the employer often will not immediately know whether a given injury will ultimately be reportable, prohibiting interference with medical care for *all* injuries would promote the deterrent effect.

Illinois Central also argues that interpreting subsection (c)(1) to apply to injuries during, but not caused by, work trespasses on the domain of the FELA, which the Fifth Circuit has explained "provides the *exclusive remedy* for a railroad employee engaged in interstate commerce whose injury resulted from the negligence of the railroad."[27]  *Rivera v. Union Pac. R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004) (emphasis added).  But this is a problem for Illinois Central's proposed interpretation as well, because to the extent overlap occurs, it cannot be avoided by either interpretation of the statute.  Both Illinois Central's and Jones' interpretations of subsection (c)(1) render a rail carrier potentially liable under FELA and the FRSA for delaying or discouraging treatment of at least some on-the-job injuries.  *See Santiago*, 2012 WL 3255136, at *12 (recognizing that "there can be overlapping remedies common to both [FELA and FRSA claims]" such that "an employee who files a whistleblower complaint under the FRSA can also file a negligence claim under the FELA").

Furthermore, unlike in a FELA action, a violation of section 20109 of the FRSA is punishable by punitive damages of up to $250,000 dollars.  49 U.S.C. § 20109(e)(3).  Accordingly, limiting those in Jones' position to a FELA claim insulates employers from the deterrent effect of punitive damages in circumstances where, as the Court has already explained, employers may be equally incentivized to discourage employees from receiving treatment.  Such

---

[27] R. Doc. No. 38-3, at 2.

an interpretation of subsection (c)(1) cannot be what Congress intended.   Accordingly, the regulatory purpose of subsection (c)(1) provides an alternative basis for the Court's holding.

## CONCLUSION

The Court concludes that Jones' injury, which admittedly was initially brought on as the result of the manifestation of a pre-existing condition during the course of his employment, does entitle Jones to the protection of subsection 20109(c)(1) of the FRSA.   This interpretation is compelled not only by the plain meaning of the statute, but also by the legislative history and regulatory purpose behind subsection 20109(c)(1).   Accordingly,

**IT IS ORDERED** that Illinois Central's motion for summary judgment with respect to Count II of Jones' amended complaint is **DENIED.**

New Orleans, Louisiana, October 7, 2015.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**